## Case No. 3,509.

### CUSHING et al. v. LAIRD.

[6 Ben. 408; 7 Am. Law Rev. 762.] [1]

District Court, S. D. New York. April Term, 1873. [2]

FOREIGN ATTACHMENT—GARNISHEES — EFFECT OF A DECREE IN A PRIZE CASE—NOTICE TO MASTER —PARTY—ESTOPPEL — PRACTICE — ANSWERS TO INTERROGATORIES—EVIDENCE.

1. A libel in prize was filed, in June, 1865, against the steamer Wren, in the district of Florida. The master, S., appeared and filed a claim, as bailee for the owner, alleging that L., a British subject, was the owner, as appeared by the register of the steamer. The district court condemned the vessel as enemies' property, and a writ of venditioni exponas was issued, and the vessel was sold, and the proceeds were deposited with the assistant treasurer of the United States, in New York, subject to the order of the court. An appeal was taken from that decree to the supreme court of the United States, which reversed the decree, and directed restitution of the vessel to the claimant. F. and T., attorneys, in New York, directed and had charge of this appeal, and paid the expenses of it, and obtained the mandate of the supreme court. They then obtained a power of attorney from L. and S., authorizing them to collect the proceeds of the Wren, and receive the restitution decreed. After the decree in the supreme court, but before the mandate was filed, C. and others, the present libellants, by their proctor, W., filed a libel, in the district court of Florida, against L., and issued a foreign attachment against the proceeds of the Wren, as his property. F. and T. thereafter employed an attorney in Florida, who filed the mandate and a copy of the power of attorney from L. and S. to them, and entered a final decree in the prize case, directing the payment of the money to L., claimant. The same attorney also entered a special appearance for L., as respondent, in the suit brought by C. and others, and moved to dissolve the attachment. In the mean time, negotiations took place between W., the attorney for C. and others, at New York, and F. and T., looking to a removal of that second litigation to New York, and it was agreed that W. should make no objection to the removal of the fund to New York, and that F. and T. should receive it under their power from L. and S., and hold it long enough to enable W. to take such legal steps as he might be advised. Accordingly, instructions to that effect were sent to Florida, the attachment there was dissolved on the entry of an absolute appearance for L., and the funds were paid to F. and T., in New York. Thereupon this suit was commenced by W., for C. and others, against L., and a foreign attachment was issued against these funds in the hands of F. and T., as the property of L., and the funds were duly attached. F. and T. thereupon appeared, on the return of the attachment. Interrogatories to them were filed, to which they filed answers, denying that they had any funds of L. in their hands, and setting up, that, before the commencement of the prize suit, the Wren had been sold by L. to one P.; that they had acted, in all that they had done, as attorneys for P., and had never been retained by L., and that the proceeds in question were the property of P., and not of L. This issue being brought to trial, the libellants offered in evidence the complete record in the prize case, and the record in the other suit in the Florida court, and proof of the agreement between W. and F. and T. F.

and T. then offered in evidence their own answers to the libellants' interrogatories, and a bill of sale of the Wren from L. to P., dated and recorded before the commencement of the prize suit, and proof of their retainer by P., and not by L. P. was a member of the firm of Frazer, Trenholm & Co., agents of the Confederate States, at Liverpool. *Held*, that the answers of F. and T. to the interrogatories addressed to them by the libellants were not evidence in their favor.

[Cited in Havermeyers & E. Refining Co. v. Compania Transatlantica Espanola, 43 Fed. 91.]

2. That the final judgment in the prize case was a judgment that the Wren was the property of L.

3. That neither P. nor F. and T., who had procured that judgment to be rendered, could be heard now to allege the contrary of the fact there adjudged.

4. That F. and T. were estopped by what had taken place between them and W., from saying, in this suit, that the proceeds of the Wren were not the property of L.

5. Notice of a prize suit against a vessel given to her master, is notice to her real owner, and he is a party to such prize suit.

6. The claimant of a vessel, seized as prize of war, is allowed to give the papers of the vessel in evidence, and is, therefore, bound to see that they are true papers.

The question in this case was, whether the libellants [John N. Cushing and others], under the attachments issued herein, and levied on certain moneys in the hands of Foster and Thomson, as garnishees, were entitled to regard such moneys, for the purposes of such attachments, as having been, when such attachments were levied, the moneys of the respondent, John Laird, the younger. The libel was filed to recover damages for an alleged maritime tort. After the issuing of the process, several motions were made respecting the attachments and the returns to them, which are reported in 4 Ben. 70 [Cushing v. Laird, Case No. 3,508]. Foster and Thomson, the garnishees, having appeared and filed an answer denying the possession of any funds belonging to Laird, the respondent in the action, interrogatories to them were filed by the libellants, and their answers to those interrogatories were also filed. On the trial of the issue between them and the libellants, the former offered in evidence their answers to the interrogatories. These were excluded by the court, which held that the answers of garnishees to interrogatories proposed to them by the libellants were not evidence in favor of the garnishees. The facts of the case sufficiently appear from the arguments of counsel and the opinion of the court.

E. H. Owen, on behalf of the garnishees, presented to the court the following points:

I. The libellants must establish, by competent testimony, that the proceeds in question were the property of the respondent at the time the attachment was served on the garnishees. The burden of proof is upon them to do this.

1. There is no oral testimony upon the sub-

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 7 Am. Law Rev. 762, contains only a partial report.]

[2] [Reversed in Case No. 3,510.]

ject showing or tending to show that fact. All that the libellants rely upon to establish it is, that the master of the steamer, in and by his claim in the prize suit, stated that, as he was informed and believed, the steamer belonged to the respondent. But that in itself is not sufficient. The libellants have no greater rights to the proceeds than the respondent. If, under the testimony in this case, he could not recover the same from Prioleau, then they cannot. Drake, Attachm. § 458.

2. It is manifest that, upon the evidence herein, the respondent could not recover these proceeds from Prioleau. Having sold and conveyed the steamer to Prioleau, in good faith, and by a valid and legal bill of sale, and having received a full and valuable consideration therefor, which he still retains, it would be unconscionable and unjust in him to claim these proceeds, and such a claim would not be allowed, or even tolerated, by this court.

3. But, to evade such an apparent and gross wrong, the libellants invoke the record in the prize suit, as a technical estoppel. It is claimed by them, that it was adjudicated in that suit, that the steamer belonged to the respondent, and therefore Prioleau is estopped to deny it in this action. This the garnishees deny. The libellants have no more right in law or equity to insist upon such estoppel, than the respondent would have if he were prosecuting to recover these proceeds; and to allow him to use it, as against Prioleau, would be in the highest degree unjust. An estoppel should not be employed to shut out and exclude the truth, nor where its use will work a wrong or cause injustice. Its whole force and effect are to preclude parties, and those in privity with them, from unsettling a matter which they have in solemn form admitted and adopted, or which has been actually adjudicated. And it cannot be seriously contended, that the prize suit settled, or was intended to settle, the ownership of the steamer as between Prioleau and the respondent. Its whole object and purpose was to determine the status of the vessel, that is, whether she was owned by enemies of the government, or had violated the blockade, and so was a lawful prize of war.

II. But, the decree or sentence offered by way of estoppel is not admissible for the purpose of establishing the respondent's title to the proceeds, nor does it estop Prioleau from setting up his title thereto.

1. It is res inter alios acta. The suit wherein it was pronounced was between other and different parties, the issue was different, and the suit was brought for a different purpose, and therefore inadmissible. Aspden v. Nixon, 4 How. [45 U. S.] 467, 499.

2. Even as a sentence of a prize court having exclusive jurisdiction of the matter in controversy, it is inadmissible, because it does not purport to adjudicate the question of the

actual ownership of the steamer. In determining what was adjudicated in that suit, this court should not look at the testimony contained in the printed record, nor at the briefs and points of counsel, nor even at the decision of the supreme court, all of which were offered and received under objection, and should now be excluded. But it must look at and examine simply the sentence. The law upon this subject is well settled. Fisher v. Ogle, 1 Camp. 418; Dalgleish v. Hodgson, 7 Bing. 495; Bradstreet v. Neptune Ins. Co. [Case No. 1,793]; Calvert v. Bovill, 7 Term R. 523; Christie v. Secretan, 8 Term R. 192; Ocean Ins. Co. v. Francis, 2 Wend. 64, 68, 69; Bigelow, Estop. pp. 164, 185.

3. Upon examining the sentence of the district court, it appears that that court did not adjudge that the steamer, when captured, was owned by the respondent, nor that Prioleau was not her owner. The libel did not allege that she was owned by the respondent. It simply alleged that she had been captured and brought into Key West, and that she was "lawful prize of war, and subject to condemnation and forfeiture as such." To this, Stiles, as master and bailee of the vessel, in his own name, filed a claim, denying that she was prize of war, and claiming her "for the owner thereof." This was all he had a right or could properly do, since he could not know, and did not pretend to know, to whom she belonged. It was the only proper pleading in the suit. He, however, added that the respondent was owner, as appeared by her register, and as he believed, which was wholly unnecessary, and should be regarded as surplusage. The issue should have been, and was, in fact, simply, prize or no prize. Anything stated in the claim beyond that was "irregular and improper." The Cheshire [Case No. 2,655]; The John Gilpin [Id. 7,343].

This being the true issue, what did that court decide? The sentence, after erroneously reciting that the master had interposed a claim "for and on account of John Laird, the younger," and that it appeared to the court that the steamer, her tackle, etc., were, at the time of capture, the property of enemies of the United States, proceeds as follows: "It is now ordered, adjudged and decreed, that the steamer Wren, her tackle, apparel, furniture, and cargo be condemned and forfeited to the United States, as lawful prize of war." There is nothing in this sentence which adjudicates that the steamer was the property of the respondent, which was indispensable to make it an estoppel in this suit and as against Prioleau.

In the case of Fisher v. Ogle, cited above, and which is a leading case, it appeared that the ship Juno had been captured by a French privateer, carried into Martinique, and there condemned in the vice admiralty court. The vessel had been insured, being represented to be American. In an action on the policy, the defendant, to falsify the representation

of neutrality, gave in evidence the sentence of condemnation, which, after stating that, from the papers on board, it resulted that the property belonged to English merchants, who, to mask their property, borrowed the American flag, etc., etc., went on to declare the ship as good and lawful prize, and to confiscate her and her cargo to the profit of the captors, but without stating any specific grounds for the condemnation. Lord Ellenborough held that the sentence did not say that the ship was not American, and that it was not evidence of what it does not specifically affirm; that, looking at the adjudicative part of the sentence, nothing was stated as to the ship or her cargo not being American; and the record was excluded. This case was referred to, and fully approved by Mr. Justice Story, in the case of Bradstreet v. Neptune Ins. Co., also cited above, who, speaking of such a sentence, says: "The facts and grounds ought to appear ex directo, in order to estop the parties in interest from denying or questioning them. I agree with Lord Ellenborough in Fisher v. Ogle, that courts of justice are not bound to fish out a meaning when sentences of this sort are produced before them. Whatever points the sentence professes, ex delicto, to decide, they are bound to respect and admit to be conclusive. But, if the sentence be ambiguous or indeterminate, as to the facts on which it proceeds, or as to the direct grounds of condemnation, the sentence ought not to be held conclusive." The case of Dalgleish v. Hodgson, above cited, is to the same general effect. That case determines also that the sentence commences with the adjudicating clause.

In the present case, it commences with the words, "It is now ordered," &c. That this is so appears also by the mandate, wherein the recital of the decree commences with these words. The district court did not, therefore, adjudge that the steamer was not the property of Prioleau, nor that she was the property of the respondent, and does not, therefore, estop Prioleau from setting up his title to the proceeds.

4. Nor did the supreme court adjudge that the steamer was not the property of Prioleau, or that she was the property of the respondent. The mandate, after reciting the decree of the district court (commencing with the words, "It is now ordered"), and that the cause had been heard, proceeds as follows: "It is now here ordered, adjudged and decreed by this court, that the decree of the said district court. in this cause be, and the same is hereby, reversed; and it is further ordered, that the cause be, and the same is hereby, remanded to the said district court, with directions to restore the vessel and cargo to the claimant, without costs." This is all that is said, and there is not in this any adjudication that the vessel belonged to the respondent, or that she did not belong to Prioleau. Now there is an evident fallacy in the libellants' argument, "that upon such a libel

and such a claim the sentence of the court established conclusively against all the world," that the steamer was owned by the respondent, so as to preclude inquiry upon that subject in this court. Allen v. U. S. [Case No. 240]. The master had claimed the vessel "for the owner thereof," and the supreme court .decreed restitution to the claimant, but that did not affirm the property to be in him, nor in any person in particular. The district court had not given, as a reason for condemning the vessel, that she was owned by any one in particular. It merely stated, which was not true, that a claim had been filed by the master "for and on account of John Laird, the younger, a British subject." But it did not adjudge that he was or was not the owner of the vessel. Nor was it necessary to do so in order to pronounce such sentence of condemnation. She was condemned as being enemies' property, and such condemnation was reversed on appeal. This case, therefore, comes clearly within those above cited, and, under the rulings therein, the record should be excluded as immaterial and incompetent to prove the respondent's ownership of the property in the hands of the garnishees, or to estop Prioleau from asserting his title to the proceeds. Allen v. U. S. [supra]; Millengar v. Hartupee, 6 Wall. [73 U. S.] 258.

III. The garnishees, in obtaining the proceeds, have not done anything which does, or can, in any manner estop Prioleau from alleging his ownership thereto, nor which estops them from setting up such ownership against the libellants' claim. Representations to the libellants in regard to the ownership of the proceeds will not estop Prioleau from asserting his rights thereto. Drake, Attachm. § 629, and note a; Lewis v. Prenatt, 24 Ind. 98. But, in fact, no such representations were made either by the garnishees or by Prioleau. Merely obtaining and using the power of attorney from the respondent and Stiles did not acknowledge that the respondent had any right to or interest in the proceeds, or estop the garnishees or Prioleau from disputing his ownership. The power was executed by Stiles, the claimant, as well as the respondent. It was joint and several, and this court cannot find, from the evidence, that the garnishees used the respondent's power in obtaining the proceeds. His power, as appears by the testimony, was obtained out of caution, for the convenience of the garnishees, to meet such obstacles, if any, as might arise from his name having been improperly inserted in the claim as the owner of the steamer. But he could not avail himself of this to recover the proceeds from Prioleau. He certainly could not do so, even if there had been a collusion between them to mask the real ownership of the vessel, and to have her pass as belonging to him as a citizen of a neutral government. Having obtained the proceeds, the respondent could not, if he would, recover the same from

Prioleau. De Metton v. De Mello, 12 East, 234; Drake, Attachm. § 458.

IV. Nor did the order of the district court, entered on filing the mandate, directing the proceeds to be paid to "John Laird, claimant," establish, as against Prioleau, the fact that he was owner of the vessel, or that he was the claimant. There was no adjudication on that question at that time; nor had there been any previously. The mandate directed that the proceeds be paid to the claimant, not to the respondent, and the district court had no right to assume the determination of that question. Stiles was, in fact, the claimant. He claimed, as master and bailee for the owner, whoever he might be, and the mandate directed payment to be made to him as such claimant. Dockray, whose name appears to have been inserted in the order as proctor for "John Laird, claimant herein," and who moved the court for a final decree, upon filing the mandate, had no authority so to appear for, or so to use the name of, the respondent. His name was so used without the knowledge of Prioleau or of the garnishees. The fact that Dockray had so used it was not known to the garnishees until after they had received the proceeds, and so they did not acquiesce therein or ratify the same, by receiving the proceeds. Bell v. Cunningham, 3 Pet. [28 U. S.] 289; Hays v. Stone, 7 Hill, 128; Brass v. Worth, 40 Barb. 648, 654. Moreover, the libellants cannot avail themselves of the acts of Dockray, to establish, by way of estoppel in pais, the title of the respondent to the proceeds. They have not suffered any injury by his acts or representations, nor by any acts or representations of the garnishees. They have not parted with anything or lost any rights, and they are therefore "strangers," and not entitled to the benefit of the alleged estoppel. Com. Dig. Estoppel, C; Heane v. Rogers, 9 Barn. & C. 577; Dezell v. Odell, 3 Hill, 225.

V. It was stated, in the presence of the court, that Prioleau was a member of the firm of Frazer, Trenholm & Co., who were enemies of the government, and that, if the supreme court had known this, it would have condemned the vessel as enemies' property. This, however, is mere conjecture. There is no evidence upon which such inference can be founded, and it is unjust towards Prioleau, who, for aught that appears in this case, was a neutral citizen, as well as the respondent. Nor is there any evidence that such firm was an enemy of the government. The libellants cannot import into this case evidence taken in other prize cases to establish this or any other fact. Nor can this court take judicial notice of what may have been proved in other cases between other and different parties. Seymour v. Marvin, 11 Barb. 85, 86. Whether Prioleau was or was not an enemy of the government, or what the court would have directed if his true status in regard to the steamer had been known, is wholly immaterial in deciding this case.

VI. The libellants' claim to the proceeds should, therefore, be dismissed, and the suit also dismissed for want of jurisdiction.

T. C. T. Buckley, also counsel for the garnishees, presented the following argument:

Pursuant to the rules and practice of this court, Foster & Thomson, when cited as garnishees, filed their answer under oath, in which they say, that it is not true "that at the time of the service of the several processes in this action, or at any time since, any goods, chattels, choses in action, property, credits or effects were in their hands, or under their control, belonging to the above respondent."

It is conceded by the counsel for the libellants that the burden of establishing the possession of such funds rests upon them. But, on the facts disclosed by the uncontradicted evidence on both sides, it is established that such proceeds belong to Charles Kuhn Prioleau, and not to the respondent Laird. The steamer Wren was built by John Laird, Jr., at Birkenhead, in the year 1864. Her construction was completed in the month of December in that year, and the said Laird, being then her owner, registered her at Liverpool, her home port, on the 24th of said month, and received from the customhouse authorities a' register, which accompanied the vessel. She then started upon a voyage and never got back to Liverpool. On the 3d day of January, 1865, Mr. Laird sold the said steamer, then on her voyage, to Charles K. Prioleau, who on that day paid him therefor the sum of £15,450 sterling, as appears by the bill of sale, read in evidence and marked "Exhibit No. 1," the execution and delivery of which was admitted on the trial. The transfer was duly registered in accordance with the laws of England, at the customhouse at Liverpool, as fully appears by Exhibit No. 2, which is in evidence in the cause.

On the 13th of June, 1865, while on a voyage from Havana to Liverpool, her crew mutinied, took possession of the steamer, and ran her into Key West, where she was libelled by the United States authorities as lawful prize of war, the government of the United States claiming the mutinous seizure as the equivalent of a lawful capture. At that time she was commanded by one Edward C. Stiles, who, in the discharge of his duties as master, put in a claim on behalf of the registered owner, Laird, Stiles having no information of the facts above recited, with reference to the change of title, and having been placed in charge of the vessel as master only upon her departure from Havana, two days before her capture.

The vessel was condemned on the ground (as appears by the prize record) that, at the time of capture, she belonged to enemies of the United States, the view of the government being, that she was the public property of the Confederate government. Subsequent to this condemnation, Charles K.

Prioleau, through his agent, Mr. Sellar, retained Messrs. Foster & Thomson. They, in the discharge of their duty, as Prioleau's counsel, caused the prize record to be removed to the United States supreme court by appeal, and employed counsel, with a view to obtaining a reversal of the decree, in which they succeeded. It appears, by the opinion of the supreme court (see [The Wren] 6 Wall. [73 U. S.] 583, 586), that the decree below was reversed on the ground that the proof was insufficient to show that, at the time of the capture, the Wren (as was claimed ·by the United States) was the property of the Confederate government. Nothing was decided, or in that case was necessary to be decided, for the purposes either of affirmance or reversal, except the question of the property of the Confederate States; and any ownership of Laird is only referred to by the judge who delivered the opinion, as being a presumption inferable from the contents of the certificate of registry found on board the vessel. The mandate of the supreme court reversed the judgment appealed from, and directed restitution to the claimant, Stiles, who, by virtue of his position, was necessarily, in judgment of law, trustee for the actual owner of the vessel, whoever he might be, and who in this case, in fact, was Charles K. Prioleau. An attempt was made by the United States officials at Key West, to interfere with the execution of the judgment of the supreme court, but, as it has no relevancy to the issue before the court, it need not be considered.

On the 2d day of July, 1868, for the purpose of collecting the proceeds on behalf of their client, Mr. Prioleau, Mr. Thomson caused to be prepared a power of attorney from Stiles, the claimant, in which, evidently for greater caution, is inserted as well the name of the registered owner, Laird, and the same was sent by him to Mr. F. A. Dockray, whom he retained to collect and remit the proceeds referred to in the power. At that time, the libellants had filed a libel in the district court, in Florida, against Mr. Laird, for the same cause of action as that embraced in the present suit, and were seeking, under process of foreign attachment, to ·arrest the proceeds of the Wren in the registry of the court there, and the validity of such attachment was contested. Some negotiation ensued between Mr. Thomson and the resident counsel of the libellants, Mr. Ward, which resulted in a letter from Mr. Thomson to Mr. Ward, written by mutual arrangement, and containing a suggestion that Foster & Thomson should draw the funds (meaning the proceeds of the Wren in the registry) under their authority from the claimants, Laird and Stiles, and keep the proceeds in their hands sufficiently long to enable Mr. Ward to serve upon them any process that he might be advised.

Mr. Thomson testified, that when, in this letter, he used the expression "claimants, Laird and Stiles," he referred to them as being the parties named in the record of the supreme court, and not as actual claimants of the fund. It further appeared, from his evidence, that he never knew or had any communication or correspondence, written or verbal, with the respondent, Laird, but acted throughout, in the whole proceeding, as the representative of Mr. Prioleau, through his agent, Mr. David P. Sellar, and that the power of attorney referred to in his letter to Mr. Ward was received by him from Mr. Prioleau ·through Mr. Sellar. Under the arrangement referred to in the letter, as explained by Mr. Thomson in his testimony, the money was received, no stipulation, or understanding, or agreement being claimed to exist outside of the promise of the letter, which was fully acted up to by Messrs. Foster & Thomson, viz., to keep the proceeds long enough to enable Mr. Ward to attach them here if he could. The obvious advantage resulting to Mr. Ward, and sought for by him, was that, in Florida, the funds were in custody of the law, and here they were not. Mr. Thomson testifies, that there was no stipulation made and entered into between him and Mr. Ward, in reference to any appearance being given either in Florida or here for Laird, and the appearance which, on the face of the Florida record, seems to have been given by Mr. Dockray, was utterly without authority, and unknown to Foster & Thomson until the receipt of his letter of apology, which did not come to hand until after they had drawn the large check.

First Point. Under this process of garnishment the libellants have no greater rights against Foster & Thomson than Laird himself could have. If Laird could not sue them for the proceeds of the Wren and recover, they cannot be held under the attachment.

1. It is settled law, that it must be affirmatively established that the garnishees have property. No presumption can be indulged in. Ben. Adm. (2d Ed.) §§ 427, 459; Drake, Attachm. §§ 458, 461.

2. Even a direct representation made by the garnishee to the creditor, as to funds, if any had been made, would not estop the garnishee, when cited under an attachment, from showing the true state of the case. Drake, Attachm. § 629a.

Second Point. As between Laird and Prioleau, Laird could not either have or enforce any claim to the proceeds of the Wren, which he had sold, and for which he had been fully paid.

1. Payment to Prioleau would have been a perfect defence at law to Foster & Thomson, if sued by Laird.

2. As trustee, holding the legal title, Laird would have been compellable, in equity, to furnish Prioleau with the means of collecting the fund in question.

3. His intervention was, therefore, nothing more than that of a nominal party signing

formally a receipt for a fund in which he had no personal interest, and which he was bound to see came into the hands of the representative of his vendee.

Third Point. The libellants' attempted appropriation of Mr. Prioleau's property cannot be maintained. The proceedings in prize, shown by the record, do not estop Prioleau, the true owner of the fund, from showing his ownership, in a collateral controversy between persons who are neither parties or privies to such proceedings in prize. As against Mr. Prioleau there cannot exist any estoppel in pais.

1. No case has ever held that, in a contest between strangers to a record in prize, the real owner of the property, in a collateral controversy, is estopped from showing facts, in reference to his title, which were not before the prize court. The vice of the libellants' argument is, that it overlooks the distinction between the case where title is claimed directly under the decree and the case now before the court. His counsel rely on loose expressions found in text-books and opinions, without examining the facts of the particular cases cited. To illustrate and enforce the above proposition, reference is especially made to the case of Maley v. Shattuck, 3 Cranch [7 U. S.] 458, 487, where Marshall, C. J., held, that the sentence of a prize court was not conclusive on a question of title arising in a subsequent proceeding. It is also laid down, in Phillips on Evidence, that the decision of a prize court is an estoppel only as to the point put in issue and directly determined. 1 Phil. Ev. p. 334, and note 627.

2. The well settled rule is, that, to work an estoppel by a record, the parties and subject-matter must be the same. See Clemens v. Clemens, 37 N. Y. 74.

3. The supreme court itself, in a case similarly situated, did not hold a special proceeding an estoppel. Millinger v. Hartuple, 6 Wall. [73 U. S.] 258.

4. It cannot, for one moment, be disputed, if Laird, himself, had collected the money, and had paid it over to an agent of Mr. Prioleau's, he, Prioleau, being the beneficiary and equitable owner of the money so paid over, that, in the agent's hands, the property in that money could not be changed back again to Laird by any determination as to Laird's title to the fund before it was paid over. This is precisely this case; the proceeds of the Wren, when received by Foster & Thomson, the agents of Prioleau, were, in fact, in the possession of Prioleau himself, and this money cannot be taken, under this process, out of the hands of Foster & Thomson, unless it could be taken out of Prioleau's pocket, in an action by Laird.

5. There is no estoppel in the case; both parties stood on equal ground; no representation was made by the garnishees, of any matter of fact.

6. The motives which led either side to con-

sent to the withdrawal of the fund from Florida are not material. By tacit arrangement the motives of the parties were left mutually undisclosed, and it is not for the court to speculate as to what they were.

Something was said, in the argument, that, if Mr. Prioleau's claim to this money had been presented to the court at Washington, or in Florida, the result of the original controversy would have been different. There is nothing, in the judgment of the court on appeal, or in the facts of the case, which warrants such a presumption, but it is difficult to see how that can inure to the benefit of these attaching creditors, who are absolute strangers, in law and in fact, to the proceedings in the prize court.

Fifth Point. The garnishees should be discharged, with costs.

R. D. Benedict and J. Langdon Ward, for the libellants, presented the following argument:

First Point. The question before this court is, whether John Laird, the younger, was the owner of the proceeds of the Wren when they came into the hands of these garnishees. The libellants, for proof that he was such owner, rely mainly upon the record evidence of the judgment of the prize court. In considering this evidence, two questions arise, namely: (1) What did the court decide? (2) What is the effect of that decision?

Second Point. The supreme court decided that the Wren was the property of John Laird, Jr.

(a) The Wren was libelled simply as prize. The master claimed her, as bailee of said Laird, a British subject, as owner, and for and on account of said Laird, and the court decided that the Wren was the property of enemies of the United States. The question before the supreme court, on the appeal, therefore, was only this, "whether the vessel was owned by said Laird, a British subject, or by enemies of the United States?" This was the point argued by counsel, and was the very point decided by the court. See [The Wren] 6 Wall. [73 U. S.] 586. The court say: "The certificate shows that the claimant is the builder and owner. * * * The claimant not only built the vessel, but put his master in command. * * * These acts, in connection with the registry, afford strong evidence that the title of the vessel was in the claimant." Whom did the supreme court mean by "the claimant?" They meant John Laird, Jr. Not Stiles, for he did not build the vessel or put any master in charge of her. Not Prioleau, for he did not appear. The garnishees, who now claim to have represented him, were careful to keep any such idea from the mind of the supreme court. They stood by, and their principal stood by, in their persons, and heard the supreme court say: "The title to this vessel is in the claimant." They knew that the supreme court meant, by "the claim-

ant," John John Laird, Jr., and, when the mandate of that court directed the vessel to be restored "to the claimant," they knew that that mandate meant to restore it to John Laird, Jr., and to him alone. And thereupon they procured the decree of the district court in Florida, which decreed that the money should be restored to John Laird, Jr. The sole foundation of this decree was, that the supreme court had found, as a fact, that, when the Wren was seized, she was the property of John Laird, Jr., and of no one else.

(b) The supreme court not only actually did decide this question, but were compelled to decide it. As the counsel for the garnishees aptly puts it, "the whole object and purpose of the prize suit was to determine the status of the vessel." She was libelled as prize. All the world were cited to appear and interpose their claims to her. Laird alone appeared, and claimed her as his. Every one else, by their silence, gave up to him such claim on her as they had. The district condemned her as enemy's property. This decree necessarily negatived Laird's claim of ownership, and from it Laird appealed. The supreme court, in order to determine that the vessel was not enemy's property, had to determine that she was the property of somebody else, and to determine also who that somebody else was, or they could not have told whether she was enemy's property or neutral property.

(c) The garnishees' brief argues that "Stiles was in fact the claimant." This seems to be a most remarkable misrepresentation of the case, or misunderstanding of the law of prize.

1. It is stated that "Stiles claimed, as master and bailee, for the owner, whoever he might be." Not so. He claimed as "bailee of, and for and on account of, John Laird, Jr.," whom he described as owner. The garnishees' counsel do not agree on this point, for Mr. Buckley's brief says, that Stiles "put in a claim in behalf of the registered owner, Laird."

2. It is also stated, that the words of the claim, "as bailee of John Laird, Jr., the owner thereof," are "surplusage," and are "irregular and improper," and the cases of The Cheshire [Case No. 2.655], and the John Gilpin [Id. 7,343], are cited in support of this statement. Those cases, however, merely hold, that it is "irregular and improper" to add to a claim charges of misconduct against the captors, or defences extraneous to the prize issue. But the allegation of ownership is essential. In the very case of The John Gilpin [supra], it is said, "the claim should be one of property merely." Stiles could make no claim of property as master only. Being master, he must claim for the owner. And, so far from its being the case that "he could not know, and did not pretend to know, to whom she belonged," he was bound to know that fact and to state it

truly. The master, at least, must be cognizant of the true nature of the transaction.

3. Claims by masters of vessels in this form are frequent in prize cases, but, when they are so interposed, it is not the agent but the principal, not the master but the owner, who is the claimant. We cite the following cases in this court: The Crenshaw [Case No. 3,384]. Claim filed by Irwin & Co., "in their own behalf and that of Scott & Clarke. * * * The claimants, Clarke & Scott, intentionally violated the blockade." The General Green [Id. 5,313]. Atwell, the master, interposed a claim alleging that the vessel belonged to Mr. Oppenheim. "The only question," says the court, "is whether the vessel, being owned by the claimant, Oppenheim," &c. The Cheshire [supra]. Craig, the master, filed a claim, averring that Jos. Battersby was the owner of the vessel, and Jos. and Wm. Battersby were owners of the cargo. But the court speaks of "the present claimants, J. & W. Battersby." The Sally Magee [Case No. 12,260]. Here, also, a claim was interposed by the master, but the court says, "the claimants can secure no exemption," etc.

4. The law on this point is clearly enunciated by Mr. Justice Story, in his article on "Prize," 10 Ency. Am. p. 364, § 15, subd. 3. He says: "No claim is permitted to be put in unless by the master or correspondent or agent of the owner, or by the consul of the nation. A mere stranger having no interest is not permitted to claim. It has been already stated that a claimant in a prize court must be the general owner of the property."

5. The decision of the supreme court in the case of The Wren shows that that court did not consider the allegation of Stiles, that he was bailee of Laird, as surplusage, for that speaks only of Laird as the claimant, never of Stiles as such. And, if there were any doubts on the subject, these garnishees have made it certain by the final decree which they procured to be entered, directing the proceeds to be restored to "John Laird, Jr., the claimant." Since "a claimant must be the general owner of the property," this decree has the same force as if it read, "restored to John Laird, Jr., the general owner of the property."

6. The counsel of the garnishees (citing Fischer v. Ogle), has argued, that this court can only look at the sentence, and not at the recitals of the decree. It seems somewhat extraordinary, after reading Lord Ellenborough's remarks in that case of Fischer v. Ogle, about "the piratical way in which the French sentences proceed," that this court should be referred to such a case as a rule by which it is to construe the decisions of our own supreme court and of a sister court of equal authority with itself, and that, too, in favor of a foreigner as against our own citizens. Other cases show that the recitals are often referred to to throw light upon the sentence. Pollard v. Bell, 8 Term R. 434; Bird v. Appleton, Id. 562; Kindersley v. Chase,

cited in 2 Park, Ins. pp. 743, 747, 748. But, even if this court is limited to looking at the sentence alone, it makes no difference. The mandate directs that the vessel be restored "to the claimant," and the final decree declares that the proceeds are to be restored to John Laird, Jr., the claimant; and the claimant, as we have seen, must be the owner.

Third Point. That decision is conclusive of the fact decided, and cannot be contradicted or questioned.

(a) The judgment of a prize court, being the judgment of a court of exclusive jurisdiction, proceeding in rem. is binding on the whole world, and is conclusive both of the right established and of the fact decided. In Croudson v. Leonard, 4 Cranch [8 U. S.] 437, Mr. Justice Washington says: "It is a well-established rule, in England, that the judgment, sentence or decree of a court of exclusive jurisdiction, directly upon the point, may be given in evidence as conclusive between the same parties, upon the same matter coming incidentally in question in another court for a different purpose. It is not only conclusive of the right which it establishes, but of the fact which it directly decides. This rule, when applied to the sentences of courts of admiralty, whether foreign or domestic, produces the doctrine I am now considering, upon the ground that all the world are parties in an admiralty cause. The proceedings are in rem, but any person having an interest in the property may interpose a claim," &c.

In Penhallow v. Doane, 3 Dall. [3 U. S.] 86, Patterson, J., says: "The sentence of a court of admiralty or of appeal, in questions of prize, binds all the world as to everything contained in it, because all the world are parties to it. The sentence, as far as it goes, is conclusive to all persons." And Iredell, J., in the same case, in deciding that the erection of courts of admiralty was a function delegated to congress exclusively, says (page 91): "A prize court is, in effect, a court of all the nations in the world, because all persons in every part of the world are concluded by its sentences, in cases coming clearly within its jurisdiction. Even in the case of citizen and citizen I do not think it a proper subject for mere municipal regulation, because, as was observed at the bar, a citizen may make a colorable claim which the court may not be able to detect, and yet a foreigner be fatally injured by it. In case of a bona fide claim, it may appear to be good by the proofs offered to the court, but another person, living at a distance, may have a superior claim which he has no opportunity to exhibit." Palpably, no foreigner could be fatally injured by the presentation of a colorable claim in a case of prize, unless a sentence, awarding the res to the colorable claimant, concluded the real owner.

In Bradstreet v. Neptune Ins. Co. [Case No. 1,793], Story, J., says: "That the sentence of a foreign court of admiralty and prize, in rem, is in general conclusive, not only in respect to the parties in interest, but also for collateral purposes, and in collateral suits, not only as to the direct matter of title and property in judgment, but also as to the facts on which the sentence professes to proceed, although formerly subject to much doubt and controversy, is now a point fully established in courts of England and the courts of the United States."

In Bolton v. Gladstone, 5 East, 155, Lord Ellenborough, C. J., says: "Since the judgment of the house of lords in Lothian v. Henderson, it may now be assumed, as the settled doctrine of English law, that the sentences of foreign courts, of competent jurisdiction to decide all questions of prize, are to be received here as conclusive evidence in actions on policies of assurance, upon every subject immediately and properly within the jurisdiction of such foreign courts, and upon which they have professed to decide judicially." Barzillay v. Lewis (MSS.), reported in 1 Marsh. Ins. (2d Am. Ed.) p. 368, was an action against the insurers. The ship, originally a French vessel, was captured and condemned at Liverpool, where the name Three Graces was given her. She was then bought by a Liverpool merchant for a house in Amsterdam, her name translated into Dutch, a Dutch pass was sent her from Amsterdam, she was insured warranted Dutch property, sailed for Amsterdam, and was captured by the French and condemned as The Three Graces, of Liverpool. The insurers put the condemnation in evidence, as proof of a breach of the warranty, and it was held conclusive. Lord Mansfield said: "The warranty meant that the ship was Dutch to the purpose of being protected, and the sentence of the court of appeal in France is conclusive. The question, then, is, what the sentence means. The ship is condemned as not being Dutch. The warranty was that she was Dutch, which was false. * * * If the sentence had gone on a ground collateral to the property, the plaintiff would have been permitted to go into evidence to show the truth of the warranty."

In the case at bar, the sentence of acquittal went on the ground that the Wren was the property of John Laird, Jr., and was, therefore, not enemy property, as which she had been condemned below, and is conclusive on that point. Had the sentence gone on ground collateral to the property, the garnishees might possibly have been admitted to show want of title in the claimant. Could there be any doubt as to the grounds on which the sentence of acquittal was pronounced by the supreme court, after reading the opinion of that court, and the decree of the Florida court entered on the mandate, the certified copies of the briefs of counsel, offered by the libellants, are clearly admissible to resolve the doubt. Calvert v. Bovill, 7 Term R. 523.

In this case, where this question was

raised, Mr. Justice Lawrence said: "The cases alluded to in the argument seem to have established this, that, if it can be collected from the sentence itself, on what ground the foreign court decided, that would be conclusive in any action brought in this country. But, if it were ambiguous, or did not show on the face of it on what ground they proceeded, then the court here might receive evidence to show what were the grounds of the decision abroad."

To the same point are Hudson v. Guestier, 4 Cranch [8 U. S.] 293; Stoughton v. Taylor [Case No. 13,502].

(b) The only case cited in behalf of the garnishees, as opposed to the above authority, is the case of Maley v. Shattuck, 3 Cranch [7 U. S.] 458. An examination of that case will show that it is no authority against us. The decree of the prize court in that case will be found on page 465, and only adjudged that the vessel and her cargo "were good and lawful prize." When that decree came before the supreme court, that court only held that, as the vessel might have been a good and lawful prize, although she were the property of the neutral claimant, the decree that she was good prize was not a decree that she was not his property. Page 488.

It is a very long step from that decision to the decision which the garnishees seek to procure from this court, viz., that the decree of a prize court restoring a vessel to a neutral claimant, is not a decision that she was his property. Such a decree of restoration must be a decree that she is the property of the claimant, because, as the supreme court say in the case of The Siren, 7 Wall. [74 U. S.] 154: "When they (the United States) proceed in rem, they open to consideration all claims and equities in regard to the property libelled." The decision of the court must, therefore, determine all claims and equities.

(c) The decree of the prize court is, of course, effective to pass the title to a vessel which is sold under it. But its effect is by no means limited to that case. Where the question of prize or no prize depends upon the question of enemy's property, the decree of the prize court determines the question of the title to the vessel at the time of the seizure. That is a fact on which the "direct matter of title and property in judgment," as Judge Story says, is based.

A little consideration will show good reason for this rule. Why does a prize court examine the papers of a vessel to determine the question of prize or no prize? Because the law requires: (1) That "a claimant must be the general owner of the property." (2) That every vessel shall tell the truth about herself; that her papers shall be true; and that her master shall be informed of the true character of the transaction (letter of Sir Wm. Scott and Dr. Nichol, given in Upt. Mar. Warf. & Pr. 268), and, of course, that,

when examined as a witness, he shall state that character truly. Falsehood, either in papers or testimony, is fatal to the vessel. As Dr. Lushington has said: "The court of prize never goes on a mere formal instrument. Over and over Lord Stowell has said: 'It is not the documents themselves which the court goes upon.' They must be true. They must be bona fide." The Ocean Bride, 2 Spinks, 20.

Acting upon this principle, the prize court looks to the papers of the vessel and the evidence of those on board of her, and from them it determines the fact on which the "matter of title and property" depends. And it must be borne in mind, also, that all the world are parties to a prize proceeding, and for this reason any one may intervene who is the real owner of any part of the vessel, and may defend his interest as suits him best. In The Mary, 6 Cranch [10 U. S.] 144, Marshall, C. J., said: "The whole world, it is said, are parties in an admiralty cause, and, therefore, the whole world is bound by the decision. The reason on which this dictum stands will determine its extent. Every person may make himself a party and appeal from the sentence; but notice of the controversy is necessary in order to become a party, and it is a principle of natural justice of universal obligation, that before the rights of an individual be bound by a judicial sentence, he shall have notice, either actual or implied, of the proceedings against him. When these proceedings are against the person, notice is served personally or by publication; when they are in rem, notice is served upon the thing itself. This is necessarily notice to all those who have any interest in the thing, and it is reasonable because it is necessary, and because it is the part of common prudence for all those who have any interest in it to guard that interest by persons who are in a situation to protect it. Every person, therefore, who could assert any title to the Mary, has constructive notice of her seizure, and may fairly be considered as a party to the libel."

The prize court, therefore, virtually says to all the world, in all cases where the question of enemy property is concerned: "We propose to try the question of the title to this vessel, and to try it on these papers on board of her, which are required to tell the truth. If you have anything to say why we should not so determine it, come forward and say it, otherwise hold your peace hereafter." Thus saying, its determination is conclusive, on the facts involved, against all the world —and so it ought to be. For any one who would afterwards maintain that the facts were not in accordance with the decision, must maintain that the papers of the vessel and the evidence of the master, on which the decree of the court was founded, did not conform to the truth. And this no one, who was in any way interested in the matter, will be allowed to maintain.

(d) Look for a moment at the circumstances of this case. Read the remarks of the supreme court about the "matters for well-grounded suspicion" in the "facts and circumstances surrounding the history of this vessel." Can any reasonable man doubt that, if this fact, by which it is now sought to overthrow that decision of the supreme court, had been thus made to appear, it would have turned the scales of justice, which obviously hung in doubtful balance?

If the fact of this bill of sale, from Laird to Prioleau, had appeared, either on the registry or on the evidence of the master, is there any doubt as to its effect upon these "well-grounded suspicions?" The status of Mr. Prioleau, as was argued before the court, "was established by the judicial records of Great Britain and the diplomatic history of the late contest." Counsel might have added, "and by the judicial records of our own courts." If they had proceeded to read from the opinion of Mr. Justice Clifford, in the case of U. S. v. The Lilla [Case No. 15,600]: "Direct testimony is exhibited in the record which requires explanation. The deponent Gleason testifies that Frazer, Trenholm & Co., of Liverpool and Charleston, owned the vessel and her cargo when she was taken, and that the two houses have the same name in each of those places," Mr. Justice Clifford would probably have said to counsel, as Lord Stowell said, "I do not forget the information which I have received from other cases." 2 Spinks, 10, note.

Can there be a moment's doubt that this fact was studiously concealed from the knowledge of the court? And can this court now hold that a party who, by concealing a fact from the knowledge of the court, has procured the decree which he desired, will now be permitted to set up that fact against the decree? If Mr. Prioleau was before the court, would the court hear him saying, "The papers of my vessel did not tell the truth. The master of my vessel either falsified or else did not know the truth of the transaction. I pray you now to allow me to prove that falsity." That would be to overthrow the settled policy and principles of prize law. It would be to offer a premium for concealment and falsification.

(e) The conclusiveness of the judgments of courts of exclusive jurisdiction proceeding in rem, both as to the right declared and the grounds on which the sentence professes to proceed, has been affirmed in many cases other than those of prize.

In Street v. Augusta Ins. [& Banking] Co., 12 Rich. Law. 13, which was an action on a policy of insurance to recover for damages suffered by a collision, the defendants pleaded the negligence of the plaintiffs as a defence, and offered the sentence of an admiralty court condemning the plaintiffs' vessel in damages by reason of such negligence, on a libel by the owners of the other vessel. Held conclusive.

In Magoun v. New England Marine Ins. Co. [Case No. 8,961], which was an action to recover the value of a vessel which rotted pending a litigation to condemn her for smuggling, resulting in her acquittal, the defendants offered to prove probable cause of seizure, which the decree of acquittal negatived, and also that the master swore falsely, etc. Story, J., said: "The most that can be said is, that the master concealed the facts, &c., and that thereby both courts were misled in their decrees. But concealment of facts would be a new head of the law upon which to avoid a sentence of condemnation or acquittal in rem. * * * It appears to me that, independently of fraud (a point which will be presently considered), the sentence is conclusive."

In The Apollon, 9 Wheat. [22 U. S.] 362, Story, J., says: "A decree of acquittal on a proceeding in rem, without certificate of probable cause of seizure, is conclusive evidence, in every inquiry before every other tribunal, that there was no such cause."

In Rose v. Himely [Case No. 12,046], Johnson, J., says: "The jurisdiction of the court of admiralty is of a peculiar nature, acting wholly in rem, and not affecting the rights of any persons whomsoever, except so far as they exist in the thing which is the subject of the libel. Its decrees are laid down to be conclusive against all the world, a doctrine which, as to the right of property in the subject libelled, is strictly and universally correct, whenever the court is erected within the jurisdictional limits of the power which constitutes it, when the subject is of admiralty jurisdiction, and the court professes to sit and judge according to the law of nations and the style of the admiralty." And in the same case [4 Cranch, 8 U. S.] Marshall, C. J., says (page 276): "If the court of St. Domingo had jurisdiction of the case, its sentence is conclusive."

Whitney v. Walsh, 1 Cush. 29, was a case where suit was brought to recover back the purchase money paid for cigars, which, after the sale, were condemned as smuggled. The defendant objected to the record of condemnation because he was not a party to the proceeding. But the court held that it was not only admissible but conclusive. Wilde, J., says: "It is a well established principle that the sentence or decree of a court of admiralty and maritime jurisdiction in rem is binding on all the world as to the points in issue and judgment thereon."

Gelston v. Hoyt, 3 Wheat. [16 U. S.] 246, was a case where, after acquittal of property seized for violation of revenue laws, without certificate of probable cause, suit was brought against the marshal for damages for the seizure, and, when he offered evidence of probable cause, the decree was held conclusive against him. Story, J., said: "The reasonableness of this doctrine results from the very nature of proceedings in rem. All persons having an interest in the sub-

ject-matter, whether as seizing officers, or informers, or claimants, are parties or may be parties to such suits so far as their interest extends. The decree of the court acts upon the thing in controversy, and settles the title to the property itself, the right of seizure and the question of forfeiture. If its decrees were not binding upon all the world upon the points which it professes to decide, the consequences would be most mischievous to the public. In case of condemnation, no good title to the property could be conveyed, and no justification of the seizure could be asserted under its protection. In case of acquittal, a new seizure might be made by any other person, toties quoties, for the same offence, and the claimant be loaded with ruinous costs and expenses." In Story, Confl. Laws, § 592, it is said: "In cases of this sort (that is, in rem) it is wholly immaterial whether the judgment be of acquittal or condemnation. In both cases it is equally conclusive."

(f) Such judgments settle the title to the res. Marshall, C. J., in Williams v. Armroyd, 7 Cranch [11 U. S.] 423–432, says: "It appears to be well settled in this country, that the sentence of a competent court, proceeding in rem, is conclusive with respect to the thing itself, and operates as an absolute change of property. By such sentence the right of the former owner is lost, and a complete title given to the person who claims under the decree." See, also, Gelston v. Hoyt, supra.

1. The truth of this proposition in cases of sentences of forfeiture or condemnation need be sustained by no quotation of authority.

2. That it is equally true in cases of acquittal, is manifest, since, in such cases, ex necessitate rei, the court must decide to whom the property belongs, in order to determine to whom it shall be delivered.

In the case of The Panama [Case No. 10,703], the court say: "The court, being rightfully in possession of the funds representing the ship arrested, must necessarily, as incident to that possession, have power to decide who is entitled to withdraw them from the registry."

In The Mary Ann [Id. 1,195], the court says: "The process acts on the thing itself, and places it in the custody of the court. When thus in its possession, the court is bound to preserve it for all who have an interest in it, and not to deliver it but to those who prove a title." To the same effect is Andrews v. Wall, 3 How. [44 U. S.] 568–573.

3. In close analogy to this case is that of the grant of probate or administration.

Ennis v. Smith, 14 How. [55 U. S.] 400. This was an action to recover for the descendants of the sisters of Kosciusko, as his next of kin, funds in the United States, belonging to him and as to which he died intestate. The court below dismissed the bill

on the ground (among others) that the plaintiffs had not proved themselves the next of kin of the deceased. The only proofs offered in that behalf were decrees of the government of nobility at Grodno, and of the court of Kobryn in Lithuania. The competency of the jurisdiction of these tribunals in matters decided upon by these decrees was proven. The supreme court reversed the judgment of the court below, and in their opinion, referring to this decree, say: "It is not a judgment inter partes, but a foreign judgment in rem, and is evidence of the facts adjudicated, against all the world."

In Noell v. Wells, 1 Lev. 235, 236, it was held, that "a grant of probate or administration is in the nature of a decree in rem, and actually invests the executor or administrator with the character which it declares belongs to him. Accordingly, such grant of probate or administration is conclusive against all the world." It may, indeed, be shown that the grant was revoked, for that is the further act of the same court, or that it was forged, for that shows it not to be the act of the court at all, or that it was granted by a court having no jurisdiction, for then it is a nonentity. But it cannot be shown that the testator was mad, or that the will was forged, for those facts might have been alleged in the ecclesiastical court in opposition to the grant of probate.

So, in this case, the garnishees may show that the decree of the Florida court has been reversed, or that the record of that decree is forged, or that that court had no jurisdiction. But they cannot show that Laird was not the owner of the Wren, for that fact might, and, if true, should, have been alleged in the prize court, in opposition to the final decree.

Fourth Point. The judgment of the prize court is so conclusive upon the question of the title to this vessel, that if, after that decree of restoration, Laird had taken the vessel, or her proceeds, into his possession, Prioleau could not have recovered them from him. If Prioleau and Laird were the parties before this court, the decree of the court must be for Laird. De Metton v. De Mello, 12 East, 234. This case and the case at bar are singularly alike. This was an action for money had and received to recover the proceeds of a cargo shipped by the plaintiffs at Lisbon for Nantes, captured, libelled as prize, claimed by the defendant, and restored to him. It appeared that the defendant was was a clerk for the plaintiffs, and lent his name to neutralize the property. Ellenborough, C. J., at the circuit, nonsuited the plaintiffs, on the ground that it did not lie in their mouths to gainsay that the property of the cargo was in the defendant, after he had, with their privity and consent, put in a claim, as owner, before the court of admiralty, which had been induced, on that statement of facts, to award restitution of the cargo to the defendant, as neutral prop-

erty belonging to himself. A rule nisi for a new trial was refused by the king's bench, with the following opinion:

"Ellenborough, C. J.: I think that the plaintiffs are estopped by their own act in setting up and establishing, in the court of admiralty, the claim of De Mello to this property, from now turning around and insisting upon it as their own. If they could have shown that De Mello had acted tortiously, as against them, in setting up a false defence and claim to the cargo as his property in that court, that might have served them; but, on the contrary, it appeared that he had acted all through with their privity and consent. De Mello may have behaved like a rogue to the plaintiffs, but both plaintiffs and defendant have behaved wrongfully, as against this country, in colluding to make French property appear to be Portuguese, in the court of admiralty, upon the question of prize as against the captors. The plaintiffs should go back to the admiralty, and have the matter set right there, that the opinion of the court may be taken upon a true statement of facts."

On the authority of this case, therefore, Prioleau could never be heard to say that this vessel was not Laird's property. No case has been suggested by the counsel for the garnishees which points to any different rule. We add the following authorities in support of it: One making an assertion of acts in court is estopped thereafter to deny it. The Mary [Case No. 9,185]. When a man alleges a fact in a court of justice for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administration of justice. Wills v. Kane, 2 Grant, Cas. 63. One who has intervened in a suit on a bottomry bond, as mortgagee, is estopped from claiming the surplus as owner. The Panama [Case No. 10,703]. But the counsel for the garnishees argue, that they received this money as the agents of Prioleau, and that the case is to be treated as though the money was now in the possession of Prioleau himself. We think that they should not, in fairness, have put forth such a claim, and that it will not be listened to by the court under the circumstances of this case.

The garnishees were acting for Mr. Laird. They knew that Mr. Ward represented this claim against Mr. Laird, and had attached this fund as his property. They inform him of their power of attorney from Laird, and they propose to him that they will receive the money "under our authority from the claimants, Laird and Stiles," and hold it here till he should have the opportunity to serve his attachment; and, this proposition being accepted by Mr. Ward, and his attachment having been thereupon vacated by him, they now turn around and say, "We received the money, not under our power from Laird and Stiles, but as agents for Mr. Prioleau." Such

a change of position is neither equitable nor legal. If Mr. Thomson had stated to Mr. Ward that he was acting for Mr. Prioleau, he would not have obtained the consent to discharge the attachment. He held his peace when he should have spoken. He should be compelled now to hold his peace when he would speak. "The rule of law is clear, that when one, by his words or conduct, wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that behalf, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things, as existing at the same time." Pickard v. Sears, 6 Adol. & E. 469.

Such is this case. Mr. Thomson's words and conduct certainly caused Mr. Ward to believe that Thomson's position was that of attorney in fact for Laird, and that the position of the fund, as to the right to attach it as the property of Laird, would not be affected by its being received by Mr. Thomson. Acting on this belief and assurance, Mr. Ward vacated the attachment. Mr. Thomson is then concluded from averring a different state of things existing at the time, and alleging that, in receiving the money, he was agent for any one except Laird.

Fifth Point. The above propositions being true, it follows that the evidence offered by the garnishees must be excluded. No evidence can be received against the decree of the prize court, unless it be evidence of a title acquired subsequent to the seizure.

(a) But there is no evidence of any such subsequently acquired title. The only evidence offered to prove title in Prioleau is the bill of sale of January 3d, 1865, executed five months before the seizure.

(b) As to this paper, there is no evidence of its bona fides, or that it had any actual consideration. Suspicion is cast on it from the fact that it was not recorded at the customhouse at the port of registry, until May 1, 1865, four months after its pretended execution, and that it was never made to appear in the prize proceedings.

(c) The execution of the power of attorney by Laird is entirely inconsistent with the validity of the bill of sale.

(d) That power of attorney and the acts of the parties are consistent with one of three theories, namely: (1) That the bill of sale was never a reality; (2) a retransfer of the vessel to Laird; or (3) on the present theory of the garnishees, an attempted fraud on the prize court. On neither theory can it be regarded by this court.

Sixth Point. On the state of facts here shown, the libellants insist that this court must decide this case as if this court were the district court of Florida. The object and intention of Mr. Ward and Mr. Thomson, in their negotiation, was simply to transfer the litigation to this court, without in any way affecting their rights. If Mr. Thomson had any other intention, he can-

not now be allowed to bring it forward. Now, the district court of Florida would never have allowed the party who procured its decree of ownership in Laird, to allege before it that that decree was procured by concealment, and was, in fact, an imposition on the court. This court will be no more ready to allow it.

Seventh Point. The procurement by Prioleau of the decree of ownership in Laird, was practically an assignment to Laird of his interest in the vessel, if he had any. He procured a decree to be pronounced, which, per se, placed the title to the vessel where it declared it to be. He is in the same position as if he had made, executed, and delivered a bill of sale of the vessel to the claimant. This is now claimed to have been a mere cover for the purpose of defrauding the captors and the United States, and this court is asked to help the success of the artifice. But a court of admiralty, which is a court of equity, will not listen to such a claim from these garnishees, who were the active agents in carrying out the transaction. Their position is analogous to that of one who, having made a conveyance of his property to cover it against his own creditors, should apply to the court to set the assignment aside, in order to protect it from the creditors of his grantee. (a) No court would listen to such a suit. Jackson v. Dutton, 3 Har. [Del.] 98. (b) The assignment would be held good. Randal v. Phillips [Case No. 11,555].

Eighth Point. The garnishees are bound by the appearance of Dockray in Florida. They should have immediately repudiated his action, and returned the funds. They did no such thing, and are bound by that appearance and its effect. The Sally Magee, 3 Wall. [70 U. S.] 457; Benedict v. Smith, 10 Paige, 130. How, then, can they say that this fund is not the property of Laird, when, under the compulsion of its being attached as Laird's property, they have given the appearance for him, which it was the very purpose of the attachment of the fund to compel?

Ninth Point. The sum of the whole matter is this: These garnishees, acting, as they say, as agents for Mr. Prioleau, procured from the prize court a decision that a certain state of facts existed. They now seek to avoid the effect of the decree, which was based upon that state of facts, by setting up that the state of facts did not exist. They cannot be heard to make that allegation. Their action was an admission, of the most solemn character, that Mr. Laird was the owner of the Wren. It was an admission, "On the faith of which a court of justice has been led to adopt a particular course of proceeding," and such admissions are "conclusive." 1 Greenl. Ev. (12th Ed.) p. 234, § 204. It is contrary to public policy that they should be allowed to avoid the effect of that adjudication of the prize court, and thus secure for themselves, or for the principal whom they claim to have been assisting, the fruits of a fraud, which, as they seek to show, was practiced upon that court, not only with the knowledge, but by the active interference of them all. "Allegans suam turpitudinem non est audiendus."

BLATCHFORD, District Judge. On the 16th of June, 1865, the United States filed a libel, in admiralty, in the district court of the United States for the southern district of Florida, against the steamer Wren and her cargo, alleging, in the libel, that certain persons, citizens of the United States, on the 12th of June, 1865, captured the Wren and her cargo, on the high seas, as prize of war; that the captured property had been brought into Key West, in said district; and that it was lawful prize of war, and subject to condemnation and forfeiture as such. It prayed a condemnation of the property. An attachment was issued against the Wren and her cargo, and was returned duly executed. A monition, in the usual form, was also issued, returnable June 27th, and was returned duly executed.

On the 26th of June, 1865, a claim and answer signed "Edward C. Stiles, master British steamer Wren," and duly verified, was filed in the cause. It says: "And now comes Edward C. Stiles and says, that he is the master of the said steamer Wren, and, as such, is the lawful bailee of said steamer, her tackle, apparel and furniture, and claims the same for the owner thereof; and he further says, that John Laird, a lawful British subject, residing in England, is the true and bona fide owner of said steamer, and that no other person is the owner thereof, as appears by the register of said steamer, now in possession of the court, and as he is informed and believes." The answer also denied, that the steamer was prize of war, and averred that she had no cargo, and prayed restitution.

On the 15th of August, 1865, a decree was made in the cause, in these words: "A claim having been interposed for this vessel and cargo by Edward C. Stiles, master of said vessel, for and on account of John Laird, the younger, a British subject, and this cause having been heard on the libel and proofs and testimony taken in preparatorio, and pleadings of the claimant, and all due proceedings having been had, and the court being fully advised in the premises, and it appearing to the court that the said steamer Wren, her tackle, apparel, furniture and cargo, were, at the time of capture, the property of enemies of the United States, it is now ordered, adjudged and decreed, that the said steamer Wren, her tackle, apparel, furniture and cargo, be condemned and forfeited to the United States, as lawful prize of war." The decree also ordered a sale of the property.[3]

---

[3] [See Case No. 16,768.]

From the testimony in the prize cause, it appears that the main question in issue was, whether the Wren belonged to Laird, a subject of Great Britain, residing in Liverpool, and was bona fide neutral property, or whether she was really the property of the government of the Confederate States, or of the firm of Frazer, Trenholm & Co., acting for and representing such government. A certificate of registry was found on board of the Wren, at the time of her seizure, dated at Liverpool, December 24th, 1864, signed by a registrar, which specified December 24th, 1864, as the date of registry, and stated that the Wren was British built, and was built by Laird Bros., at Birkenhead, in 1864, that her port of registry was Liverpool, that John Laird, the younger, of Birkenhead, shipbuilder, was the owner of the whole of her, and that William Raisbeek was her master. The Wren, when seized, was on a voyage from Havana to Halifax and Liverpool. She was seized by persons forming part of her crew. She had previously been engaged in running the blockade, into Galveston, Texas, from Havana, and, a short time before she began the voyage on which she was seized, she had entered the port of Galveston, discharged a cargo, taken one of cotton on board, and carried it safely to Havana. From the decree of the prize court an appeal was taken, on behalf of the claimant, to the supreme court of the United States. On the 16th of October, 1865, a writ of sale was issued, under which the vessel was sold. The proceeds of sale, amounting to $37,108 50, were deposited with the assistant treasurer of the United States, at New York.

The appeal was heard by the supreme court, and it reversed the decree of the court below. The case is reported in 6 Wall. [73 U. S.] 582. In the decision of the supreme court, as reported, the question is stated to be, whether the vessel was the property of the enemies of the United States. It is also stated therein, that the certificate of registry shows that "the claimant" (Laird) is "the builder of the vessel and owner;" that "the proofs show, with reasonable certainty, that his" (Laird's) "registered master brought the vessel to Havana, and was there engaged in command of her within three months after she was launched and fully equipped for the voyage, and which was within three months of the time when she was seized, as prize, by her crew." The decision proceeds: "It is quite apparent, therefore, upon the proofs, that the claimant" (Laird) "not only built the vessel, but put his master in command, in this, her first voyage, and the presumption would seem very strong, if not irresistible (nothing else in the case), that he continued the owner for the short period of six months which elapsed after she was built, and before the seizure took place. In addition to this, she was in the command of a master" (Stiles) "claiming to represent Laird as owner. These acts, in connection with the reg-

istry, afford strong evidence that the title of the vessel was in the claimant." The decision, then, after holding, that most of the proofs relied on to disprove such evidence were "inadmissible and incompetent as testimony in a court of justice" because they did "not rise to the character or dignity of testimony in any court that respects the law of evidence," goes on to say: "We agree, that, in the facts and circumstances surrounding and attending the history and operations of this vessel, and of the individuals connected with her, there are matters for well-grounded suspicion and conjecture, as it respects the purpose and intent with which the vessel was originally built and sent to Havana; and, as she entered immediately on furnishing supplies to the enemy and receiving cargoes of cotton in return, it is not unreasonable or unnatural to suspect, that the so-called Confederate States, or their agents, had some connection, if not interest in her. But this alone is not evidence on which to found a judgment, in the administration of justice. The facts, that the master, Stiles, who was put in command of her for the voyage home, from Havana to Liverpool, was an officer in the enemies' naval service, and had belonged to the United States navy, and Helms, who was in some way, not explained, connected with her voyages in running the blockade, and who was the agent of the enemy at Havana, might well be entitled to consideration and weight on the question, if there had been any legal proof in the case laying a foundation for such a conclusion. So, also, would the evidence that Stiles destroyed, at the time of the capture, a letter from Helms, agent of the ship, as he calls him, to himself, and an order for the payment to him of £40, on the delivery of the ship at Liverpool. But, in the view we have taken of the case, there is no foundation of legal proof of the ownership of the vessel in the Confederate States, on which these circumstances can rest, or be attached, as auxiliary considerations, to influence the judgment of a court."

From the language of the decision of the supreme court, it is apparent, that, from the fact that Laird built the vessel, and that she was registered in his name as builder and owner, and that the master named in the certificate of registry brought her from Liverpool to Havana, and was in command of her at a time less than three months after her registry, and less than three months before her seizure, the court presumed, because there was no competent evidence to the contrary, that Laird continued to be the owner of the vessel at her seizure, especially as Stiles claimed to represent Laird as owner. On this the court concluded that, as Laird was a British subject, and was not shown to be the representative or agent of the Confederate government, the vessel was not enemies' property at the time of her seizure. It is also apparent, that the court thought, that,

on the facts and circumstances disclosed by the proofs, there was good ground for suspicion that the Confederate government, or its agents, had some connection with, or interest in, the vessel, but that there was no legal proof of the existence of such connection or interest, so as to uphold the decree condemning the vessel as enemies' property.

The master, Stiles, in his deposition, in the prize case, in answer to the interrogatories in prize, states, that the vessel "belonged to one Laird, Junior, as he inferred from the register, and was informed;" that "he believes that one Laird, Junior, was owner of the vessel at the time she was seized;" that "he only knows that from the register," and that "the deponent was engaged to take the vessel to Liverpool and deliver her there to Frazer, Trenholm & Co." The master, also, in that deposition, speaks of Helms as "the agent of the vessel" "at Havana;" and the supreme court, in its decision, speaks of Helms as "the agent of the enemy, at Havana."

It appears, by the evidence in the present case, that Foster and Thomson, after the decree of condemnation was made, were retained by one Charles K. Prioleau, who has for many years been a member of the firm of Frazer, Trenholm & Co., to attend, on behalf of Prioleau, to the prosecution of the appeal to the supreme court. Foster and Thomson do not know Laird, and never saw him, and never had any communication or correspondence with him, written or verbal. On that retainer, Foster and Thomson caused the transcript of the record on the appeal from the district court in Florida, to be sent to the supreme court, and made the necessary deposit of money with the clerk of the latter court, and employed counsel to argue, and who did argue, the appeal in the supreme court, and they have paid such counsel for his services.

The brief of such counsel, filed in the supreme court, on the appeal, asserts it to be shown by the record, that the Wren was never sold or transferred, and was owned by Laird, the younger, at the time of her seizure; that she was owned in England, by an Englishman, and had never been owned by any one else; that she was at all times the property of a British neutral; and that, therefore, she was never the property of enemies of the United States. It was not disclosed to the supreme court by Foster and Thomson, or by Prioleau, that, prior to the seizure of the vessel, Laird had parted with all his interest in the vessel, or had sold and conveyed her to Prioleau, or that Prioleau had any interest in her at the time of her seizure.

The case was decided by the supreme court on the 23d of March, 1868. The mandate of that court designates the suit as one between the United States, libellants, and "the steamer Wren and cargo, and E. C. Stiles, claimant, respondents." It recites the decree of the district court in the suit, and then orders that such decree be reversed, and that

the cause be remanded to such district court, "with directions to restore the vessel and cargo to the claimant, but without costs," and then commands such district court that such further proceedings be had in the cause in conformity to the opinion and decree of the supreme court, as ought to be had.

Foster and Thomson received such mandate, and then drew a power of attorney to be executed by Laird and Stiles, and caused it to be sent to Prioleau, with instructions that he should procure it to be executed by Laird and Stiles, and should cause it to be returned to Foster and Thomson. It was so executed. It bears date July 2d, 1868, and was returned, executed, to Foster and Thomson. By its terms, Laird and Stiles appoint Foster and Thomson their attorneys, "to receive and collect from the United States government, or any branch or officer thereof, or any depositary thereof, any and all moneys, the avails or proceeds of the sale of the steamer Wren and her cargo, sold under decree of the district or circuit court of the United States, at Key West, in the southern district of Florida, by the marshal of the United States for the said district, the said decree having been reversed by the supreme court of the United States, on appeal, and this power having been given to our said attorneys for receiving restitution of the avails of the said steamer Wren and cargo."

On the 28th of December, 1868, the libellants in this suit filed in the district court of the United States for the southern district of Florida, a libel, in admiralty, against John Laird, the younger, for the same cause of action that is sued on in this suit, and praying the same relief. On the 5th of January, 1869, Foster and Thomson wrote to Mr. Dockray, an attorney in Florida, advising him of such suit in Florida, and employing him to obtain for them the funds in court in The Wren Case, and directing him not to enter a general appearance for Laird in the suit in Florida, but only to move specially to set aside the process and any attachment against the Wren fund. On the 6th of January, 1869, the court in Florida ordered process to issue in such suit, returnable on the 3d of May, 1869. Such process was issued on the 7th of January, 1869, and was a warrant of arrest bailable in the sum of $44,622. On the same day such warrant was returned, not served. On the 26th of January, 1869, Foster and Thomson sent to Mr. Dockray a copy of the said power of attorney from Laird and Stiles, in a letter to him which said: "We lay stress on this, as the particular object we have in the matter is to receive the money under it," the power of attorney, "and we wish to have the judge's check so drawn, that we, as attorneys, may collect it." On the 20th of February, 1869, in the suit in Florida against Laird, an attachment was issued against "the proceeds of sale of the steamer Wren, now on deposit with the assistant treasurer of the United

States, in the city of New York, and subject to the order of this court," returnable May 3d, 1869. This attachment was executed by serving a copy thereof, on the 4th of March, 1869, on the assistant treasurer of the United States at New York. On the same 20th of February, 1869, a monition, in the suit in Florida against Laird, was issued, returnable May 3d, 1869, and was afterwards returned as served by publication in a newspaper published at Key West, and by posting there. Negotiations took place between Foster and Thomson and Mr. Ward, who represented the libellants in the suit in Florida against Laird, and who also represents them in this suit, respecting a disposition of the Wren funds which should transfer them to the city of New York in such manner that process of attachment in this suit should be served on them, and, on the 24th of February, 1869, Foster and Thomson wrote to Ward, suggesting that the district judge in Florida should forward to them his check on the assistant treasurer in New York for the proceeds of the Wren, and that they should draw the funds under their authority from "the claimants, Laird and Stiles," and keep the proceeds in their hands sufficiently long to enable Mr. Ward to serve upon them such process or papers as he might be advised. This proposal appears to have been substantially agreed to by Mr. Ward, for, on the 12th of March, 1869, he wrote to Mr. Bethel, his attorney at Key West, directing him to "make no objection to the forwarding by the judge," to Foster and Thomson, "of the check for the proceeds of the Wren, in accordance with the mandate of the supreme court," and saying: "Until otherwise advised, hold the suit where it is, staying further proceedings for the present, but do not discontinue. If necessary to enable the court to forward the check, stipulate as may be proper. I enclose a copy of a letter from Messrs. Foster and Thomson to their attorney" (the letter of March 13th to Mr. Dockray, next mentioned), "for your information. Advise me by telegraph the day the check leaves Key West." On the 13th of March, 1869, Foster and Thomson wrote to Mr. Dockray, advising him that Mr. Ward had decided to make no objection to the forwarding by the judge to them, of his check for the money, and enclosing to him a copy of the letter of the 12th, from Mr. Ward to Mr. Bethel, and directing him to obtain the check payable to their order, and to forward it to them. On the 18th of March, 1869, Dockray, who was attorney of the United States for the southern district of Florida, wrote to Foster and Thomson, saying: "In the case of the steamer Wren, John Laird, owner, &c., I would have written you several weeks ago, if I was at liberty to take any action in your interest. While representing the government, and bound by the instructions of the attorney general, it has not been possible for me to serve you as indicated in yours of the

5th of January last. Before the mandate of the supreme court of the United States reached the clerk of the court at Key West, the acting United States attorney had filed a petition, in a cause of possession, against the proceeds of the sale of the Wren, the monition being returnable December 1st, 1868. The attorney general, however, directed that no default be taken, nor any other steps, without further instructions. The matter seems to be in a shape to enable you to secure the benefit of the mandate of the supreme court of the United States by proper management. It is certainly my duty to obey the terms of the decree of the supreme court, as it also is to promptly and efficiently execute any instructions I may receive from the attorney general. If you will communicate with Senator Osborn, of Florida, at Washington, immediately, you may be able to obtain definite instructions to be forwarded me from the office of the attorney general. I am precluded at present from taking any steps without further directions." On the 25th of March, 1869, Foster and Thomson wrote to Mr. Dockray, saying, that they had been informed that directions had been sent from the office of the attorney general to discontinue the suit brought in behalf of the United States against the proceeds of the Wren, and adding: "These directions, together with the withdrawal of opposition by Messrs. Cushing, will, no doubt, enable you to obtain and forward the judge's check to our order." On the 26th of March, 1869, Mr. Dockray wrote to Foster and Thomson, saying that he should move to set aside the process and attachment in the suit brought by these libellants against Laird, in Florida, for want of jurisdiction. On the 13th of April, 1869, the mandate of the supreme court, and a certified copy of the power of attorney from Laird and Stiles to Foster and Thomson, were filed in the court in Florida, the latter paper being filed by Mr. Dockray. Some delay took place in the receipt, by Mr. Dockray, of the instructions from the office of the attorney general to discontinue the proceeding in the suit referred to, but they were received by him on or before the 8th of May, 1869. On that day Mr. Ward telegraphed to Mr. Bethel, directing him to consent absolutely to forwarding to Foster and Thomson the judge's check for the proceeds of the Wren, drawn to their order, and to require no bond or stipulation. On the same day, Mr. Dockray, in the prize court, in Florida, in the prize case, as "attorney and proctor for John Laird, claimant," exhibited to the court the mandate of the supreme court, and moved for a final decree in accordance with the requirements of the mandate. On the same day, in the suit in Florida brought by these libellants against Laird, a paper was filed in the court, entitled in the suit, and signed, "John Laird, by F. A. Dockray, attorney and proctor," and reading thus: "And now comes John

Laird, the respondent in this cause, and makes his general appearance herein, and claims the proceeds in the registry of this court, as attached in this suit." The record of the court states that such appearance and claim were filed by Laird. On the same day, in the same suit, a paper was filed in the court, entitled in the suit, and signed, "John Laird, by F. A. Dockray, attorney and proctor," and reading thus: "And now comes John Laird, by his attorney and proctor, F. A. Dockray, and moves the court for an order dissolving the attachment herein." Appended to, and filed with, this paper, was a consent signed by Mr. Bethel's firm, as proctors for the libellants, consenting to such motion "absolutely and without stipulation or bond." On the 10th of May, 1869, in the same suit, an order was entered, entitled in the suit, reciting that "John Laird, respondent herein, by F. A. Dockray, his attorney and proctor," had moved for a dissolution of the attachment, and that the libellants, by their attorneys and proctors, had, in writing filed, consented thereto absolutely and without stipulation or bond, and ordering "that the attachment issued out of this court, upon the proceeds of the sale of the steamer Wren, now on deposit with the assistant treasurer of the United States at New York, be dissolved." On the same day, in the prize court, in Florida, in the prize case, a decree was entered, reciting the former decree, and the appeal to the supreme court, and the action of that court, and the filing of its mandate, and stating that the costs and expenses in the proceeding, amounting to $5,666 88, had been taxed and paid to the officers of the court entitled thereto, out of the proceeds of the sale of the steamer Wren, and then, "on motion of F. A. Dockray, attorney and proctor of John Laird, claimant," decreeing that the remainder of the proceeds of the steamer Wren, amounting to the sum of $31,441 62, on deposit with the assistant treasurer of the United States at New York, and subject to the order of the court, "be paid to the said John Laird, claimant," and, further, stating that it appeared to the court, "that Foster and Thomson, of the city of New York, are the lawfully authorized attorneys in fact of the said John Laird, claimant," and then decreeing, "that the said proceeds be paid to the said Foster and Thomson." The record of the court then proceeds: "Whereupon, checks No. 199, for $29,869 62, and No. 200, for $1,572, were drawn in favor of Foster and Thomson, of New York, attorneys for Laird and Stiles, as against the proceeds of the steamer Wren, on deposit with the assistant treasurer of the United States at New York, which checks were delivered to F. A. Dockray, Esquire, attorney for Foster and Thomson, and attorney in fact for John Laird, and his receipt therefor taken." The receipt is entitled in the prize suit, and is signed, "F. A. Dockray, attorney for Foster and Thomson, of New York, attorney in fact for John Laird, claimant," and is a receipt for the two checks as drawn by the judge on the assistant treasurer, and payable to the order of Foster and Thomson. On the 10th of May, 1869, Dockray wrote to Foster and Thomson, enclosing to them the two checks, and advising them that he would write to them the next day in full, and send to them certified copies of the proceedings had on the dissolution of the attachment. That letter and the two checks were received by Foster and Thomson on the 19th of May, 1869, and on that day the amount of the larger check of the two was paid to Foster and Thomson by the assistant treasurer. The amount of the smaller check was paid to them a few days afterwards. After the larger check had been paid, Foster and Thomson received from Dockray a letter dated May 11th, 1869, advising them that he induced Mr. Bethel's firm to consent to the motion for the dissolution of the attachment, by himself agreeing to enter a general appearance for Laird, and stating his reasons for so doing, and sending to them a certified copy of the proceedings.

The funds so in the hands of Foster and Thomson are the funds which have been attached in this suit as the funds of the respondent Laird. It is not shown that Prioleau, or his agents, ever informed the prize court in Florida, that, prior to the seizure of the Wren, Laird had parted with all his interest in the vessel, or had sold and conveyed her to Prioleau, or that Prioleau had any interest in her at the time of her seizure, or claimed any interest in her proceeds which that court was restoring; or that any such information was given by Prioleau, or his agents, to Mr. Ward, or to the libellants, prior to the receipt of the fund by Foster and Thomson.

It is now set up by Foster and Thomson, that, in all their transactions respecting this matter, from the commencement of their connection with it, they were acting on behalf of Prioleau, and not of Laird; that they so acted in procuring a reversal by the supreme court of the decree condemning the vessel, and in obtaining the money from the prize court; and that they knew throughout of Mr. Prioleau's having been, for many years, a member of the firm of Frazer, Trenholm & Co. The inadmissible and incompetent testimony referred to by the supreme court, in its decision, was a part of the depositions in preparatorio, of persons on board of the vessel, and was presented as tending to show ownership of the vessel in Frazer, Trenholm & Co., on behalf of, and as agents of, the Confederate States. It consisted, partly, of the statement of one witness, that he believed that Frazer, Trenholm & Co. were the owners of the vessel at the time she was seized, that he had heard Helms, at Havana (the same person who is spoken of by the supreme court, in its decision, as the agent, of "the enemy," at

Havana), speak of Frazer, Trenholm & Co. as the owners of the vessel, that he believed the real and true property of the vessel to be in Frazer, Trenholm & Co., and that he had heard Helms say that he was the agent of Frazer, Trenholm & Co., for the Wren, and other steamers, at Havana; and of the statement of another witness, that he believed the vessel was the property of the Confederate States, and that he so believed, from what he had heard her former master say, with whom he had sailed in her.

As evidence, in the present case, of the fact that Prioleau and not Laird, at all times at and after the seizure of the vessel, owned her, and that Foster and Thomson are at liberty to maintain that they hold for Prioleau, and not for Laird, the moneys which they received from the prize court in Florida, there is produced to the court the original of an instrument signed by the respondent Laird, as "John Laird, Jr.," and dated January 3d, 1865, whereby he, described therein as "John Laird, the younger, of Birkenhead, in the county of Chester, shipbuilder," in consideration of £15,450, paid to him "by Charles Kuhn Prioleau, of Liverpool, in the county of Lancaster, merchant," transfers "sixty-four sixty-fourth shares" in the Wren to Prioleau, and covenants that she is free from incumbrances. This bill of sale was registered in the customhouse at Liverpool, May 1st, 1865.

On the part of Prioleau, acting through Foster and Thomson, it is contended, that, under this process of garnishment, the libellants have no greater rights against Foster and Thomson than Laird himself would have against them, as respects the funds in their hands; that, if Laird could not recover the funds from them, or from Prioleau, such funds cannot be held under the attachment in this case against Laird; that, inasmuch as Laird sold the vessel to Prioleau, Laird could not recover these funds from Foster and Thomson, or from Prioleau: that the question is merely one as to who, in fact, owns the funds; that the proceedings in the prize suit do not estop Prioleau from showing, in this suit, that he really owns the funds, and owned the vessel when she was seized; that the libellants have no more right to insist on such estoppel, than Laird would have, if he were seeking to recover these funds from Prioleau; and that neither the original decree of the prize court, nor the decree of the supreme court, was a decree that Laird owned the Wren when she was seized, or that Prioleau did not then own her.

It clearly appears, by the language of the decree of condemnation made by the prize court, that it condemned the Wren, as lawful prize of war, on the ground that she was, at the time of her capture, the property of enemies of the United States. The claim, put in on behalf of Laird, had averred that Laird, "a lawful British sub-

ject, residing in England, is the true and bona fide owner of said steamer, and that no other person is the owner thereof." The decree necessarily negatived this averment of the claim, and, in declaring that the vessel was "the property of enemies of the United States," declared that she was not the property of Laird. On the appeal, the supreme court, as appears from its decision, not only decided that there was no legal proof that the vessel was owned by the Confederate States, or their agents, but also decided that there was strong evidence that the title to her was in Laird, who is called by the court "the claimant," and that he owned her. From the whole case, it is manifest, that the supreme court, on the appeal taken on behalf of Laird, in order to find that the vessel was not enemy property, was obliged to find, and did find, that the vessel was the property of Laird, the claimant of her. The decree of the supreme court reversed the decree of the district court, that is, declared, in reversal of the latter decree, that the vessel was, at the time of her capture, not the property of enemies of the United States, and remanded the case, with directions to restore the vessel to the claimant. The claimant was Laird, who claimed as owner; and Prioleau, through Foster and Thomson, as is shown, in fact procured the prize court to make a decree that the $31,441 62 be paid to "John Laird, claimant," that is, to John Laird by virtue of his claim filed in the prize court, which was a claim to the vessel as her "true and bona fide owner;" and such a decree was made.

In the prize suit, if Prioleau had, in fact, an interest in the vessel, he could have interposed a claim, and put himself in a position, on the record, to contest the prosecution in the prize court, and to be a direct party to an appeal. If, in fact, he became the owner of the vessel ten days after her registry, so that he owned her substantially during the whole of her career, he was, most clearly, a party to the suit in rem against her, and Laird was no party. Notice of the suit, by attachment and publication, if notice to the owner, was notice to Prioleau. Notice to Stiles, the master, was notice to Prioleau, the real owner. In this view, Prioleau is bound by the record of the proceedings in the prize court. Croudson v. Leonard, 4 Cranch [8 U. S.] 434, 437. The attachment of the vessel in the prize suit, was notice to her owner, and, therefore, notice to Prioleau as such owner, and he was a party to that suit, and the decision in the suit binds him, and is conclusive as against him, and cannot be re-examined in this suit. The Mary, 9 Cranch [13 U. S.] 126, 144; Bradstreet v. Neptune Ins. Co. [Case No. 1,793].

But, beyond this principle, it clearly appearing that Prioleau, through Foster and Thomson, actually prosecuted the appeal in the supreme court, and procured that court

and the prize court to declare that the averment of ownership in Laird, made in the claim and answer in the prize suit, was true, and, consequently, that his, Prioleau's, present claim of ownership had no foundation, and that he also procured the prize court to restore the money, the proceeds of the sale of the vessel, to Laird, as owner, Prioleau is estopped from denying, in this suit, that Laird was such owner. Prioleau did not disclose his ownership to the supreme court or to the prize court. His assertion now is that he owned the vessel when she was seized. If his claim now were that his interest in her accrued after her seizure, there might, perhaps, be some reason for entertaining a more favorable view of his position. But he permitted Stiles to conceal the true ownership of the vessel, and to assert a falsehood to the prize court. That falsehood was asserted nearly six months after the transfer to Prioleau, and nearly two months after the entry of the transfer at the customhouse in Liverpool. Prioleau also permitted the vessel to be sailing with a certificate of registry showing that Laird was her owner, at a time when Prioleau was her owner by bill of sale from Laird, and when such bill of sale had been entered in the customhouse where the original registry, in the name of Laird, as owner, was made. In a case of libel as prize of war, the burden of proving the neutral ownership of the vessel being upon the claimant, the papers of the vessel are allowed to be evidence on the question of such ownership, and the claimant, being thus permitted to resort to them, is bound to see that they are true papers. The British merchant shipping act of 1854 (17 & 18 Vict. c. 104) provides (section 57) that every bill of sale for the transfer of any registered ship, when duly executed, shall be produced to the registrar of the port at which the ship is registered, with a declaration made by the transferee, under section 56, and that the registrar shall thereupon enter in the register book the name of the transferee as owner of the ship comprised in the bill of sale, and shall endorse on the bill of sale the fact of such entry having been made, with the date and hour thereof. In the present case, this was done, and the name of Prioleau was entered in the register book, in the office of the registrar, in the customhouse at Liverpool, as the owner of the Wren, on the 1st of May, 1865. The act also provides (section 88) that, if, on any change of ownership in the vessel, the owner desires to have the vessel registered anew, it shall be lawful for the registrar of the port at which the ship is already registered, on the delivery up to him of the existing certificate of registry, and on compliance with such of the other requisites to registry as the registrar thinks material, to make such registry anew, and grant a certificate thereof. Prioleau, therefore, might easily, within the five months and a half which elapsed between the date of the

bill of sale and the seizure of the Wren, have procured for that vessel a certificate of registry showing the ownership of her by Prioleau, and which, if on board of her at her seizure, as it ought to have been, would have made it impossible for the supreme court to decide that Laird was her owner, based, as that decision was, solely upon the certificate of registry found on board. Is it possible that a court of the United States can be seriously invoked to sustain Prioleau in committing a fraud of this character on another court of the United States, and to aid him in securing the fruits of the fraud? If Prioleau had disclosed to the supreme court, or to the prize court, the fact that the certificate of registry found on board the Wren did not state her true ownership at the time of her seizure is it not entirely clear that the decree of condemnation would not have been reversed? Prioleau must be held to be barred from the privilege of now denying what he asserted in those courts, and of now asserting what he denied in those courts. As between him and the courts of the United States and these libellants, the vessel and her proceeds belonged to Laird, whatever might be adjudged in regard to such proceeds, if either Laird or Prioleau were seeking to recover such proceeds from the possession of the other.

There is another view of this case. The agents of Prioleau did not disclose to Mr. Ward that the funds belonged to Prioleau, and did not belong to Laird. If they had disclosed to him their intention, when the funds should be released from the attachment in the Florida court, and be transferred from the custody of that court, in prize, and should reach their hands, to set up that the funds did not belong to Laird, but belonged to Prioleau, is it, on the state of proofs now disclosed, to be imagined that Mr. Ward would have consented to release the attachment? The libellants, represented by Mr. Ward, are entitled to have this court act upon the matter as the court in Florida would have acted upon it, if it had been made known to that court, before the delivery of the funds to Foster and Thomson, and before the release of the attachment, that Prioleau was the owner of the vessel when she was seized. Is it to be imagined that that court would have delivered the funds to Prioleau, or would have discharged the attachment, as one which, while issued against funds belonging to Laird, had been levied on funds belonging to Prioleau? And yet this court is asked to deliver the funds to Prioleau, and to hold them not to have been properly levied on as the funds of Laird. This case falls directly within the principle which holds a party concluded by his acts and admissions, on the faith of which a court of justice has been led to adopt a particular cause of proceeding. 1 Greenl. Ev. § 204.

In the foregoing views, I have proceeded

on the ground that, in fact, Foster and Thomson have regarded themselves as acting throughout for Prioleau, and not for Laird, and have acted throughout for Prioleau as against Laird. But it is such very action which estops them and Prioleau from now saying that the money is not Laird's money. As between them and the court in Florida, and the supreme court, and these libellants, Foster and Thomson received the money as Laird's money, and not as Prioleau's money. And, if they were to claim to hold it for Laird, as against Prioleau, it would seem, on the authority of the case of De Metton v. De Mello, 12 East, 234, that Prioleau could not recover it from them, he having colluded with Laird and Stiles to make the vessel appear to be the property of Laird, and not the property of Prioleau, a member of the firm of Frazer, Trenholm & Co., and to set up a false defence in the courts of the United States, and to deceive and impose upon such courts. I must, therefore, hold, that, for the purposes of the attachments levied in this suit, the moneys levied on thereunder in the hands of Foster and Thomson, were the moneys of the respondent.

[NOTE.— Pursuant to this opinion, a decree was made requiring the garnishees to pay the money into court; and subsequently the court entered a final decree in favor of libellants, and against Laird, for a sum of money, and subjecting the fund to the payment thereof. Appeals were taken from both these decrees, and the circuit court (Waite, Circuit Justice) dismissed the first appeal, and after a hearing on the second appeal, only, held that the fund did not belong to Laird, and reversed the decree accordingly. Case No. 3,510.]